IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| STEPHEN BENTON, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION |
| | ) | FILE NO.: 1:04-CV-3191 (BBM) |
| BRIAN HOPKINS, JOHN ANDERSON, | ) | |
| and the COUNTY OF CHEROKEE, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MOTION TO EXCLUDE TESTIMONY
OF JAMES PERSINGER AND DR. JOSEPH SABA AND
<u>BRIEF IN SUPPORT</u>**

COME NOW defendants Brian Hopkins and John Anderson, by and through

counsel, and move the Court to exclude the testimony of James Persinger and Dr.

Joseph Saba, expert witnesses identified by plaintiff.  For the reasons set forth

below, defendants' motion should be granted.

## I.    <u>INTRODUCTION</u>

Plaintiff brings this action seeking damages for injuries he allegedly

sustained during the course of his arrest on November 27, 2002, claiming that he

was subjected to excessive force.

Plaintiff has identified James Persinger ("Persinger") as a police procedures expert.   Persinger's ultimate opinion is that the amount of force used to effect plaintiff's arrest was "not justified."   Persinger's testimony should be excluded because he is not qualified to provide expert opinions on the use of force. Moreover, Persinger's conclusions are based on speculation and factual assumptions that are contradictory to the undisputed evidence in the record. Finally, Persinger's testimony does not assist the trier of fact to understand the evidence or to determine a fact in issue, as it is not based on the application of scientific, technical, or specialized knowledge.

Plaintiff was treated for his alleged injuries (migraine headaches) by Dr. Joseph Saba ("Saba").   Saba has proffered an opinion regarding the cause of plaintiff's migraine headaches.  Saba's testimony should be excluded because it is based on nothing more than temporal proximity.   In addition, Saba failed to exclude other possible causes of plaintiff's migraine headaches.   Finally, Saba's conclusions also are based upon speculation and factual assumptions that are contradictory to the undisputed evidence in the record.

## II.   <u>STANDARD OF REVIEW</u>

In <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 113 S.Ct. 2786 (1993), the Supreme Court reviewed FED. R. EVID. 702 and imposed upon

trial courts a gatekeeping role to ensure that scientific testimony is both relevant and reliable. The gatekeeping role established by <u>Daubert</u> has been extended to non-scientific expert testimony. <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 141, 119 S.Ct. 1167, 1171 (1999). The party proffering the expert testimony has the burden of establishing that the expert is qualified to render an expert opinion, that the opinion is reliable, and that the opinion would assist the trier of fact in resolving a disputed issue of material fact. <u>McDowell v. Brown</u>, 392 F.3d 1283, 1298 (11th Cir. 2004).

Because of the significance jurors place on expert testimony, courts must take care to weigh the value of such evidence against its potential to mislead or confuse. <u>Cook v. Sheriff of Monroe Cty. Fl.</u>, 402 F.3d 1092, 1111 (11th Cir. 2005) (quoting <u>Frazier</u>, 387 F.3d at 1263).

### III.   <u>ARGUMENT AND CITATION OF AUTHORITY</u>

#### A.   <u>The Applicable Law</u>

When considering whether expert testimony should be admitted, a trial court must conduct an inquiry to determine whether:

> (1) The expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in <u>Daubert</u>; and (3) the testimony assists the trier of fact, through the application of

> scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

Cook, 402 F.3d at 1107.

The threshold determination in deciding whether an expert's testimony is admissible is whether the witness qualifies as an expert in the field in which he is offering an opinion. Everett v. Georgia Pacific Corp., 949 F.Supp. 856, 857 (S.D. Ga. 1996). A witness, "whether basing testimony upon professional studies or personal experience" must employ in the courtroom "the practice of an expert in the relevant field." Kumho, 526 U.S. at 152, 119 S.Ct. at 1167.

While a witness need not, necessarily, be working in the particular field of expertise he has opined on at the time the opinion is made, in order to be qualified as an "expert," the witness must keep his knowledge current in the field in which he claims particularized knowledge. Noskowiak v. Bobst, 2005 WL 2146073 (E.D. Wis.) *5. Common sense dictates that:

> If an expert has not been involved in a particular field for a sustained period of time and he has not kept abreast of developments within that field, his claim to 'expertise' may be somewhat suspect. During that time, trends and patterns may change or be updated in an industry.

Id. at *8. Moreover, a lack of qualifications can be indicated by falsehoods in a witness' curriculum vitae. Id. (expert's resume misleading where it listed professional organizations in which expert was no longer a member.)

Even if the witness is qualified to proffer an expert opinion, the testimony must meet the Daubert standard for admission, and even the most qualified expert cannot offer an "expert" opinion unless the opinion is based on some recognized scientific method. McDowell, 392 F.3d at 1298, 1300. Expert testimony is properly excluded when the expert cannot provide any empirical data, survey, study, or literature to support the theory. Id.

This inquiry involves a two-pronged analysis. McDowell, 392 F.3d at 1298. First, the expert testimony must be reliable, and must constitute something more than subjective beliefs and unsupported assumptions. Id. Guideposts to determine the reliability of proffered testimony include the following:

> (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the technique has been subjected to peer review and publication; (3) the known and potential error rate of the methodology; and (4) whether the technique has been generally accepted in the proper scientific community. . . . In addition, other factors that a court may consider in the Daubert analysis are 'reliance on anecdotal evidence temporal proximity, and improper extrapolation.'

Id. (internal citations omitted).

The second prong requires that the proposed testimony be relevant. Id. This prong is not met where the testimony does not assist the trier of fact. Id. at 1299.

-5-

Put another way, the testimony does not assist the trier of fact unless it has a justified scientific relationship to the pertinent facts.  Id.

### 1.        Expert Testimony Must be Based on Reliable Principles and Scientific Method

As the U.S. Supreme Court has stated, "'knowledge' connotes more than subjective belief or unsupported speculation."  Daubert, 509 U.S. at 590, 113 S. Ct. at 2795.  The court must "'ensure that speculative, unreliable expert testimony does not reach the jury' under the mantle of reliability that accompanies the appellation 'expert testimony.'"  Rick v. Cheminova, Inc., 400 F.3d 1286, 1291 (11th Cir. 2005) (quoting in part McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1256 (11th Cir. 2002)).

A trial court may exclude expert testimony that is unspecific, or whose factual basis is not adequately explained.  Cook, 402 F.3d at 1111.  Likewise, testimony is inadmissible when the only connection between the conclusion of the expert and the existing data is the expert's own opinion.  Id. (expert testimony properly excluded when expert failed to articulate any generally accepted standard to support opinion); McDowell, 392 F.3d at 1300.

2. **Expert Testimony Should Not be Permitted if it Does Not Assist the Trier of Fact**

Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments. <u>Cook</u>, 402 F.3d at 1111.  Similarly, testimony should not be allowed if it expresses a legal conclusion, either explicitly or implicitly.  <u>Hygh v. Jacobs</u>, 961 F.2d 359, 363 (2nd Cir. 1992).  For example, testimony that an officer's use of force was "not justified under the circumstances" merely told the jury what result to reach and should not have been allowed.  <u>Id.</u> at 364.  <u>Accord</u> <u>Berry v. City of Detroit</u>, 25 F.3d 1342 (6th Cir. 1994).

The proffered testimony may not be used to merely repeat or summarize what the jury can understand by itself.  <u>Securities and Exchange Commission v. Lipson</u>, 46 F.Supp.2d 758, 763 (N.D. Il. 1999).  Nor may the expert be permitted to invade the jury function of determining the credibility of witnesses.  <u>Id.</u>

3. **Expert Testimony Should Be Excluded When it is Based on an Incorrect Legal Standard or on Speculation and Factual Assumptions that are Contradictory to the Undisputed Evidence in the Record**

Expert testimony is inadmissible if it is based on facts that are contradicted by the evidence.  <u>Greenwell v. Boatwright</u>, 184 F.3d 492, 497 (6th Cir. 1999). Similarly, expert conclusions are inadmissible if they are based on assumptions or

assertions that are so unrealistic or contradictory as to suggest bad faith.  Shatkin v. McDonnell Douglas Corp., 727 F.2d 202, 208 (C.A.N.Y. 1984).

Testimony that relies on an incorrect legal standard should not be allowed. Noskowiak, 2005 WL 2146073 (E.D. Wis.) *5.   In Noskowiak, the expert's opinion was barred because it relied upon irrelevant OSHA standards and, therefore, would likely mislead or confuse a trier of fact.  Id. at *5.  Moreover, testimony that has no reference to any authoritative materials is mere speculation and conjecture and should not be allowed.  Id. at *8.  For instance, an expert's opinion as to what **would** have occurred had a police officer acted in accordance with departmental directives is pure speculation.  Roberson v. City of Philadelphia, 2001 WL  210294 (E.D. Pa.) *5 (emphasis added.)

With these general principles in mind, defendants now turn to the testimony of plaintiff's proffered experts.

**B.**   **James Persinger**

On March 22, 2004, Persinger prepared a written report offering his opinion that the force used to effect plaintiff's arrest was "not justified."  (Exhibit A, March 22, 2004 Report of James Persinger.)  In formulating his opinion, Persinger relied upon, and attached excerpts from, the ASP Instructor Manual ("ASP IM"). (Exhibit B, Deposition of Jim Persinger, pp. 35, 90; Exhibit C, ASP Instructor

Manual.)  The ASP IM relied upon by Persinger, however, has not been in effect since October 2002.  (Exhibit B, pp. 35, 90.)

On September 20, 2005, Persinger supplemented his report, providing his curriculum vitae ("CV"), his fee schedule, and "refined" opinions.  (Exhibit D, September 20, 2005 Report of James Persinger.)  The only authoritative source Persinger relied upon in formulating his opinion was the outdated version of the ASP IM.  (Exhibit B, pp. 9, 55.)

### 1.    Persinger's Qualifications

Persinger is not qualified to render opinions on the use of force in general, and the use of an ASP baton in particular, because he has failed to keep his knowledge current and because he has misstated his qualifications.

Persinger was employed as a Cobb County Police Officer from 1987 through 1997.  (Exhibit B, p. 18.)  Both in his CV, and his deposition testimony, Persinger claims to be a Certified Instructor and a Certified Instructor Trainer in the use of the PR-24 police baton and ASP baton.  (Exhibit B, pp. 30-32, 41-42; Exhibit D.)  However, since leaving the Cobb County Police Department in 1997, Persinger has neither taken, nor conducted, any training classes in the use of PR-24 or ASP batons (or, for that matter, any classes dealing with the use of force.)  (Exhibit B, pp. 28-29, 33-34.)  Nor has Persinger attended any recertification, refresher, or

instructor update courses in the use of an ASP baton.  (Exhibit B, pp. 42, 81.)  In fact, in the 7-year period before he was retained to provide expert testimony in this matter, Persinger had not even reviewed any materials related to the use of the ASP.  (Exhibit B, p. 33.)

Since 1997, Persinger's experience, training, and associations have been devoted to issues surrounding computer forensics, cybercrime, and technology related issues.   (Exhibit B, pp. 42-47.)   In 2001, Persinger formed PM Investigations, a private investigation firm that specializes in computer forensics and cybercrime.  (Exhibit B, pp. 16-17.)  Persinger has never worked in any cause involving the use of excessive force, and he belongs to no professional law enforcement organizations.  (Exhibit B, pp. 17-18, 42.)

Persinger has not been involved in the field of police procedures for a sustained period of time.  During that time, he has done nothing to keep current on any use of force issue, let alone issues unique and specific to the use of an ASP baton.  Persinger's lack of current knowledge in the field is best exemplified by his acknowledgement that he was not even aware that the ASP IM had been revised until just before his deposition – 3 years after the revisions went into effect. (Exhibit B, pp. 34, 78.)

Inaccuracies in Persinger's stated qualifications also call into question his ability to render an expert opinion in this case. Persinger claims that there are no requirements to maintain ASP certification and that "once certified, always certified." (Exhibit B, p. 32, 42.) ASP, however, does have requirements for Instructor re-certification, specifically:

> Instructor Certification must be conducted by an ASP Trainer who has been certified by Armament Systems and Procedures. To maintain certification, Instructors **must** be actively involved in conducting ASP training programs. Recertification for Instructors is available through attendance at another AIC course or an Instructor update. It is recommended that Instructors attend this session at least once every three years.

(Exhibit C, pp. 4-5, § 1.06) (emphasis added). Despite this requirement, Persinger has not conducted, either actively or passively, any ASP training programs; nor has he attended any recommended ASP course or instructor update. (Exhibit B, pp. 80-81.) Indeed, since 1997, Persinger has done nothing to keep current in the use of ASP batons.

Persinger's stated qualifications with respect to the PR-24 baton are also suspect. He is not, and never has been, a certified PR-24 baton Instructor Trainer. (Exhibit E, Affidavit of Terry E. Smith.) Moreover, even though Persinger was certified as a PR-24 Instructor in 1995, his certification lapsed in 1999. (Exhibit E.)

While defendants do not argue that certification in the use of these law enforcement devises is required to be qualified as an "expert," they do maintain that a witness can hardly be qualified as an expert in the field if the witness is not even aware of the requirements for certification. Moreover, the inaccuracies in Persinger's stated qualifications, whether through ignorance or misrepresentation, call into question his ability to qualified to render expert opinions in this case.

## 2.    **Persinger's Testimony**

Even if this Court were to conclude that Persinger is qualified to render expert opinion, his opinion should be excluded because it is not reliable and will not assist the trier of fact.

Persinger has opined that the amount of force used by defendants was "not justified" because Hopkins struck plaintiff with the ASP baton in the knee, rather than center mass, contrary to the ASP manual. (Exhibit D, pp. 7-8.) However, the ASP IM in place at the time of the incident (and still in effect today) defines the knee as the center mass of the leg and not only permits, but also trains, officers to strike the knee. (Exhibit C, Training Terms, Appendix C-1.)

All ASP techniques are designed to deliver strikes to the center mass of the threat, such as center mass of the leg. (Exhibit C, p. 38, § 7.06.) The ASP IM defines the term "Center Mass" as "the center mass of the arm is the elbow, **the**

**center mass of the leg is the knee** and the center mass of the torso is the belt buckle." (Exhibit C, Training Terms, Appendix C-1.) (emphasis added.)

Persinger reconciles the discrepancy between his opinion and the authoritative source upon which his opinion is based by disregarding the ASP definition. (Exhibit B, p. 102.) He offers two reasons for doing so. (Exhibit B, p. 72.) First, Persinger claims that officers who attend basic ASP training are given a Basic Manual, not the ASP IM. (Exhibit B, p. 72.) Although he has not provided the Basic Manual to support his opinion, Persinger claims that the term "Center Mass" is not defined in the Basic Manual. (Exhibit B, p. 72.)

As a result, Persinger reaches the incredulous opinion that the information provided to ASP Certified Instructors for use in properly training other officers ASP baton techniques was not intended to be provided to the trainees. (Exhibit B, pp. 74-75.) Therefore, Persinger has disregarded an unequivocal statement from the only authoritative source he relies upon and has chosen, instead, to base his opinions on his own definition of "center mass," which, he claims, is the thigh. (Exhibit B, pp. 97-98.) Persinger renders this opinion even while acknowledging that he does not know the specifics of defendants' ASP training, and does not know if defendants' ASP Instructor informed them of ASP's definition of "center mass." (Exhibit B, p. 79.)

The second reason that Persinger disregarded ASP's definition of "center mass" is because of a picture included in the ASP IM that is intended to be used as an overhead demonstrative aid.  (Exhibit B, p. 72.)  Overhead H depicts an "offender" in an aggressive stance with a circle superimposed around the upper mid-section of his body.  (Exhibit C, Target Areas, Overhead H.)  Persinger opines that because the offender's knees are not included within the circle, the knees are not a permissible strike area.  (Exhibit B, pp. 72-73.)  Persinger offers this opinion despite acknowledging that neither the ASP IM, nor the Basic Manual, prohibits ASP strikes to the knees.  (Exhibit B, p. 95.)  More importantly, Persinger's testimony is contradicted by the ASP IM and by his own testimony.

The circled area on Overhead H includes the offender's groin, chin, sternum, and parts of his neck.  (Exhibit C, Target Areas, Overhead H.)  These areas, however, are areas that are specifically excluded from permissible strike zones. (Exhibit C, p. 38, § 7.06) ("Warning.  Do Not Target Strikes To The Head, Neck, Spine, Sternum or Groin.")  Accepting Persinger's unsupported opinion that the circled area depicts the only permissible strike zones would entail disregarding ASP's prohibitions, and Persinger's own opinion that the neck, head, sternum, and groin are impermissible strike areas.  (Exhibit B, p. 152; Exhibit D, p. 4.)

-14-

This opinion is unreliable under Daubert, and is so unrealistic and contradictory so as to suggest bad faith. Moreover, the opinion is based on impermissible assumptions and speculations. Persinger provides nothing, other than his own opinion, to support his conclusion that his own authoritative source does not mean what it specifically says. In addition, Persinger has no idea how these officers were trained, or whether they were provided the ASP definition, rather than Persinger's definition, of center mass. The only connection between Persinger's opinion and the data is his own opinion.

Persinger also opines that the use of force was "not justified" because the "typical" use of force continuum was not followed. (Exhibit D, pp. 3, 7.) Once again, Persinger has failed to support this conclusion with anything other than his own opinion. Although Persinger is not aware of any use of force continuum, other than the "typical" continuum set forth in his opinion (Exhibit B, p. 50; Exhibit D, p. 3,) the ASP IM contains a use of force continuum that is much different than the one proffered by Persinger. (Exhibit C, The Confrontational Continuum, Overhead A.) More importantly, Persinger has no knowledge or information regarding the use of force continuum utilized by the Cherokee County Sheriff Department. (Exhibit B, pp. 50-51.) Again, this opinion lacks reliability in

that it is merely Persinger's subjective belief supported only by vague references to the "typical" use of force continuum.

Persinger also opines that defendants should have used more dialogue to calm plaintiff prior to placing him under arrest. (Exhibit B, p. 52; Exhibit D, p. 7.) Despite evidence to the contrary, Persinger believes that plaintiff did not understand why he was being arrested, and speculates that if defendants had communicated more with plaintiff, it might have "slowed" the incident and plaintiff might have complied with the officers' commands. (Exhibit B, p. 22.) This opinion is pure speculation. That plaintiff <u>might</u> have complied with the officers' lawful attempts to place him under arrest had he been persuaded to do so is not proper expert testimony.

Moreover, Persinger's opinion is contrary to the law. Defendants could find no case that required a police officer to verbally convince an offender to submit to a lawful arrest before using force to gain compliance. Indeed, the United States Constitution does not require a police officer to use the minimum amount of force necessary to apprehend a suspect, <u>O'Neal v. DeKalb Cty., Ga.</u>, 850 F.2d 653, 657 (11th Cir. 1988), nor does a police officer have a constitutional obligation to refrain from using force until after warning a suspect and giving an opportunity to submit.

McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1245 (11th Cir. 2003). These are opinions based upon an incorrect legal standard and should be excluded.

Finally, Persinger's remaining opinions focus on what he describes as "effective control" over plaintiff.   (Exhibit B, pp. 66-68; Exhibit D, p. 7.) Essentially, Persinger opines that the use of force is not justified if an officer has "effective control" over an offender. (Exhibit B, p. 162-64.)  "Effective control," a term that Persinger made up, occurs when "the officer has more control over the offender than the offender has of the officer."  (Exhibit B, pp. 66-68, 164-65.) More succinctly, "effective control" goes to the person who is winning the fight. (Exhibit B, p. 166.)   Persinger agrees, however, that defendants did not have complete control over plaintiff until he was handcuffed. (Exhibit B, pp. 128-29.)

This opinion suffers from the same infirmities in that it lacks any authoritative source and is contrary to the law.  As stated above, the Constitution does not require police officers to use the minimum amount of force necessary to effect an arrest.  In addition, Persinger's "effective control" theory is unrealistic in that a police officer would never be permitted to use the amount of force necessary to gain compliance, and complete control, over an offender.  Rather, the result would be to prolong struggles, using varying amounts of force as the "winner" of

the fight shifted, and thereby increasing the likelihood of injury to the officer and offender.

Persinger's testimony does not meet the <u>Daubert</u> standard of reliability or relevancy. All of the opinions lack any authoritative or technical support. (Exhibit B, pp. 61, 67, 123, 164-65.) There is no question that Persinger's testimony will not assist the trier of fact in this case, and will serve only to confuse the issues and legal standards. Persinger's testimony should be excluded.

## C.   <u>Dr. Joseph Saba</u>

Saba's testimony should also be excluded. Additional guidance is available when the proffered expert testimony relates to causation issues, which Saba does.

A physician's opinion is not scientific when there is no attempt to rule out other possible causes of a plaintiff's complained of injuries. <u>Claar v. Burlington Northern R. Co.</u>, 29 F.3d 499, 502 (9th Cir. 1994). If a physician fails to consider alternative causes of an injury, the district court is justified in rejecting the testimony. <u>Cooper v. Smith & Nephew, Inc.</u>, 259 F.3d 194, 202 (4th Cir. 2001), citing <u>Westberry v. Gislaved Gummi AB</u>, 178 F.3d 257 (4th Cir. 1999).

In <u>Cooper</u>, the proffered expert opined that the plaintiff's failed fusion surgery was caused by a defect in an implanted medical device, and failed to consider the plaintiff's smoking habit as a possible cause, despite the existence of

an abundance of medical literature establishing a link between smoking and surgical failure. Id. Having failed to rule out other possible causes for the surgical failure, the expert's opinion was mere speculation, and the testimony was properly excluded. Id. at 203.

Mere speculation that a medical condition was caused by an event is not reliable. Everett, 949 F.Supp. at 858. In Everett, a physician opined that a plaintiff's bronchitis was caused by exposure to toxic fumes. The physician, however, did not thoroughly review the plaintiff's past medical history, and did not eliminate other causes of bronchitis, such as smoking, allergies, or working in heavy industry. Id. As a result, the testimony was pure speculation and properly excluded. Id. at 858-59.

Differential diagnosis is a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated. Westberry, 178 F.3d at 262. A reliable differential diagnosis typically is performed after "physical examinations, the taking of medical histories, and the review of clinical tests, including laboratory tests," and generally is accomplished by determining the possible causes for the patient's symptoms and then eliminating each of these potential causes until reaching one that cannot be ruled out or determining which of those that cannot be excluded is the most likely.

Id. Differential diagnosis is particularly important when a there is a history of pre-existing problems and other predisposition to a medical condition. Diaz v. Johnson Matthey, Inc., 893 F.Supp. 358, 375 (D. N.J. 1995).

Causation cannot be established merely by establishing a temporal relationship between an incident and a plaintiff's self report of symptoms. Allison v. McGhan Medical Corp., 184 F.3d 1300, 1321 (1999). A causation opinion based solely on a temporal relationship between the alleged injuries and the report of symptoms is not derived from the "scientific method" and is, therefore, inadmissible expert testimony. Schmaltz v. Norfolk & Western Ry. Co., 878 F.Supp. 1119, 1122 (N.D. Ill. 1995) (collecting cases).

Medical causation opinions based solely on self-reporting are particularly suspect when a significant period of time has elapsed between the onset of symptoms and treatment. Toomar v. Centennial Life Ins. Co., 855 F.Supp. 319, 326 (S.D. Cal. 1994). Retroactive expert testimony regarding the existence of the onset of an ailment is inadmissible speculation and should not be admitted. Id.

Saba's failed to rule out other possible causes of plaintiff's alleged symptoms. Saba treated plaintiff on one occasion on June 15, 2004, over 1-½ years after the incident. (Exhibit F, June 15, 2004 report of Dr. Joseph Saba; Exhibit G, Deposition of Dr. Joseph Saba, p. 15.) Plaintiff self-reported his

medical history and provided his version of the incident, which included a claim that he was beat on the head with a nightstick. (Exhibit G, pp. 18, 19.) Plaintiff told Saba that he began to have headaches within 2 days of the incident, and that his symptoms had not improved in the intervening 19 months.[1] (Exhibit G, p. 29.) Plaintiff also reported fainting, and complained that he was suffering from insomnia, irritability, poor concentration, sad mood, crying for no reason, and crankiness. (Exhibit F; Exhibit G, p. 29.)

Saba did not evaluate the veracity or accuracy of plaintiff's history, and accepted plaintiff's self-report as true; nor did Saba obtain plaintiff's prior medical records. (Exhibit G, pp. 7, 19.) Saba also did not take a complete medical history. For instance, Saba did not ask plaintiff how often he experienced fainting or headaches. (Exhibit G, pp. 30, 38.) Saba diagnosed plaintiff as having post concussive syndrome and migraine headaches. (Exhibit F.) In Saba's opinion, the cause of most migraine headaches is genetics. (Exhibit G, p. 31.) With respect to plaintiff, Saba opined that plaintiff had a tendency for migraine headaches, and the (alleged) blows to the head during the incident made plaintiff's migraine headaches symptomatic. (Exhibit G, pp. 31-33.) The concussion experienced as a result of

---

[1] Although Saba's records indicate that plaintiff reported having "migraines," Saba testified in his deposition that the term "migraine" was his medical diagnosis, and that plaintiff reported having "headaches." (Exhibit G, p. 30.)

the blows may have been "the straw that breaks the camel back."  (Exhibit G, p. 31.)

Saba did not perform a differential diagnosis or rule out other causes of plaintiff's diagnosed concussion.  (Exhibit G, pp. 36, 37.)  Saba testified as follows:

> If somebody, if you tell me you got hit in the head with a, with a nightstick, you know, and you you had a concussion, then I would assume beating in the head with a nightstick is a cause of a concussion.  At that, you don't have any more, you don't have a need for any more differential diagnosis.  I mean I didn't ask him if, you know, the night before he had the concussion or if he was in a boxing match two weeks before.  I mean that's, you know, somebody shots you, you die, it's, I am not going to ask any more questions.

(Exhibit G, p. 37.)

Saba acknowledges, however, that other head traumas, such falling and striking the head on pavement, or an auto accident involving head trauma or a whiplash injury, can result in head trauma sufficient to cause a concussion severe enough to lead to migraine headaches.  (Exhibit G, p. 34.)  In fact, any kind of head trauma can cause a migraine headache in a predisposed individual.  (Exhibit G, p. 36.)  Moreover, in most people, migraine headaches are cyclical, and may be triggered by stress, physical or emotional changes, and even consumption of wine, cheese, and Chinese food.  (Exhibit G, p. 45.)  Yet, Saba did not even consider other possible causes of plaintiff's migraine headaches.  (Exhibit G, p. 37.)  Rather,

Saba's opinion is based entirely on the assumption that plaintiff was struck in the head with a baton.  (Exhibit G, p. 20.)

Saba's entire opinion is based upon plaintiff's self-report of being hit in the head with a nightstick and the temporal proximity of plaintiff's self-reported symptoms.  (Exhibit G, p. 37.)  Saba's medical report concludes "The patient appears to have developed migraines without aura, intractable, very frequent.  He has no past history of migraines, therefore his migraines will be solely as a result of this injury of November 27, 2002."  (Exhibit F.)

The videotape of the incident, which has been filed with the Court as evidence in support of defendant's motion for summary judgment, unequivocally establishes that plaintiff was not struck on the head with a baton.  Indeed, plaintiff was not struck in the head with any instrument.  (Exhibit B, pp. 103-04.)

Moreover, plaintiff did, in fact, suffer from similar headaches prior to the incident; and, had suffered a head injury shortly before the incident.  In May 2001, plaintiff was involved in a motor vehicle accident where he sustained an acceleration/deceleration injury causing him "severe" neck and back pain.  (Exhibit H, Duke Chiropractic Medical Records, pp. 1,2.)  Shortly after the accident, plaintiff sought treatment from John T. Duke, M.S., D.C.  (Exhibit H, p.1.) Plaintiff complained that his neck was "popping" and "snapping" constantly, and

that he was experiencing severe headaches.  (Exhibit H, pp. 2, 3.)  Moreover, plaintiff claimed that he was having difficulty focusing and concentrating – the same symptoms that he now attributes to the incident.  (Exhibit H, pp. 2, 3.)  The injuries plaintiff sustained in the motor vehicle accident were so severe that plaintiff received chiropractic treatment on a regular basis from May 2001 through September 2001.  (Exhibit H.)

Thereafter, on September 12, 2002, approximately one month before the incident, plaintiff fell and hit his head on pavement.  (Exhibit I, Medical Records from WellStar Paulding Hospital dated September 12, 2002.)  Plaintiff was transported to the emergency room "fully packaged," where he was treated. (Exhibit I.)

Saba's testimony should be excluded because he made no attempt to rule out any other possible causes of plaintiff's condition, despite acknowledging a host of other possible causes of a concussion and/or the onset of migraines headaches.  A prior automobile accident and fall are precisely the type of events that could have caused plaintiff's symptoms, but were not ruled out.  While plaintiff was less than candid with Saba regarding his prior medical history, that in no way makes Saba's opinion any more scientific.

Moreover, crucial to Saba's opinion is the assumption that plaintiff was struck on the head with a baton. This assumption is contradicted by the evidence, as plaintiff was not struck in the head with a baton, or anything else. Saba's testimony should be excluded on this basis alone.

Finally, Saba's opinion should be excluded because it is based merely on the temporal relationship between the incident and plaintiff's self-report of symptoms some 19 months later. Such an opinion is not derived from the scientific method and is, therefore, inadmissible.

## IV.   <u>CONCLUSION</u>

For all of the above and foregoing reasons, defendants Brian Hopkins and John Anderson respectfully request the court grant their motion and exclude the testimony of James Persinger and Dr. Joseph Saba.

Respectfully submitted,

FREEMAN MATHIS & GARY, LLP

/s/Michelle J. Hirsch
Dana K. Maine
Georgia Bar No. 466580
Michelle J. Hirsch
Georgia Bar. No. 357198

100 Galleria Parkway
Suite 1600
Atlanta, Georgia 30339-5948
(770) 818-0000 (telephone)
(770) 937-9960 (facsimile)

                            R. Mark Mahler
                            Georgia Bar No. 466150
                            Cherokee County Attorney

90 North Street
Suite 310
Canton, GA 30114
(770) 479-0448 (telephone)
(770) 720-6361 (facsimile)

                            Attorneys for Defendants

MJH0946/448-41179

-26-

## CERTIFICATE OF FONT SIZE

Pursuant to Local Rule 7.1(D), I hereby certify that the foregoing has been prepared in compliance with Local Rule 5.1(B) in Times New Roman 14 point type face.

This the 1st day of December, 2005.

/s/ Michelle J. Hirsch
Michelle J. Hirsch
Georgia Bar No. 357198

## CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically submitted the foregoing *Defendants' Motion to Exclude Testimony of James Persinger and Dr. Joseph Saba and Brief in Support* to the Clerk of Court using the CM/ECF system which will automatically send electronic mail notification of such filing to counsel of record who are CM/ECF participants and mailed by United States Postal Service, first-class postage prepaid, a paper copy of the same document to counsel of record who are non-CM/ECF participants.  Counsel of record are listed below:

> David Paul Smith, Esq.
> 1409 Countryside Place
> Smyrna, GA 30080

This 1st day of December, 2005.

> /s/Michelle J. Hirsch
> Michelle J. Hirsch
> Georgia Bar No. 357198

100 Galleria Parkway
Suite 1600
Atlanta, Georgia 30339-5948
T: (770) 818-0000
F:  (770)937-9960